UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **ALAN L. DUNFORD,** | ) | **CASE NO. 1:11-CV-2028** |
| | ) | |
| Petitioner, pro se, | ) | **JUDGE JAMES G. CARR** |
| | ) | |
| v. | ) | **MAGISTRATE JUDGE** |
| | ) | **KATHLEEN B. BURKE** |
| **TERRY TIBBALS, WARDEN** | ) | |
| | ) | |
| Respondent. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

On September 26, 2011, *pro se* Petitioner Alan Dunford ("Petitioner" or "Dunford") filed the above-captioned Petition for Writ of Habeas Corpus (Doc. 1) pursuant to 28 U.S.C. § 2254. Petitioner is detained in the Mansfield Correctional Institution, having been convicted on nineteen counts, including murder, aggravated murder, complicity to murder, aggravated robbery, robbery, felonious assault, obstructing justice, tampering with evidence, and gross abuse of a corpse.  Doc. 7.  *State v. Dunford*, No. 2008-CR-62 (Ashtabula Cty. Common Pleas Ct. filed May 6, 2009).  Dunford's Petition presents the following two grounds for relief:

> Ground One: Due process violation based on the manifest weight of the evidence

> Ground Two: Due process violation in the determination of prior calculation and design to support the aggravated murder, murder, and complicity to murder convictions.

Doc. 1, p.5.

As set forth below, Dunford has not exhausted his state court remedies but arguably has a state court remedy remaining. Accordingly, the undersigned Magistrate Judge **RECOMMENDS** that the Court **DENY** Dunford's Petition and **DISMISS** this action without prejudice.  The

1

undersigned further **RECCOMMENDS** that this Court equitably toll the statute of limitations, effective September 26, 2011, on condition that Dunford pursues his state remedies within thirty days of the court's order and returns to federal court within thirty days of exhausting his state remedies.

## I. Factual Background

The Eleventh District Court of Appeals set forth the facts of this case in Dunford's direct appeal from his jury trial conviction.  These facts "shall be presumed to be correct," and Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 360-61 (6th Cir. 1998); *cert denied*, 527 U.S. 1040 (1999).  The facts, as set forth by the court of appeals on direct appeal, are as follows:[1]

{¶ 6} Over the span of an eight-day jury trial, the state presented evidence and testimony establishing that on the night of November 3, 2008, Mr. Cheyrone "Red" Kelley, a known drug dealer, was brutally stabbed, murdered and dismembered by Mr. Dunford and Mr. Anzells.

{¶ 7} Missing person notices were issued in the ensuing months by Mr. Kelley's family. Approximately three months later, the police, upon a tip from a confidential informant, Ms. Melissa Kondrat, discovered the location of the body and the perpetrators.

{¶ 8} **The Investigation**

{¶ 9} Ms. Kondrat, the aunt of Ms. West, is also a felon who is currently serving a two-to-six year term in Wyoming for aiding and abetting in grand larceny for stealing a semi-truck with her boyfriend. She lived with Mr. Dunford and Ms. West in their apartment in Conneaut Lake for a short time. At trial the defense attempted to discredit her and suggested that she turned on Mr. Dunford because she was asked to leave the apartment. She disputed the testimony of Mr. Dunford and Ms. West that they asked her to leave because she was bringing strangers home at all hours of the night, engaging in prostitution and rampant drug

---

[1] Petitioner has not disputed the Court of Appeals' statement of facts.

use, and leaving dirty syringes lying around. She claimed that she left with her new boyfriend.

{¶ 10} Ms. Kondrat informed the police that Mr. Dunford confided in her that he had killed Mr. Kelley. She was familiar with Mr. Kelley, having purchased crack cocaine from him in the past. Mr. Dunford asked her if she could keep a secret, and then confided that he had robbed somebody named "Red," killed him over crack cocaine, and disposed of the body.

{¶ 11} Ms. Kondrat testified that about a week later, Mr. Dunford confided in her again. He told her that "Youngstown Bob" Williams, another known drug dealer, had arranged for "Red" to come over. Mr. Dunford told her that when Mr. Kelley came in, he jumped him, repeatedly hit him in the back of his head, and then dismembered the body because it was too large. He then threw the body in the "backyard," which Ms. Kondrat understood to be a swampy area off of Rt. 20 in Pennsylvania.

### {¶ 12} Police Interview with Mr. Dunford

{¶ 13} The police went to Edinboro, Pennsylvania, to interview Mr. Dunford, where he and Ms. West had moved to live with Ms. West's mother during the winter. Mr. Dunford voluntarily accompanied them back to the station, first telling them that Mr. Kelley and one of his customers, Mr. Steven Anzells, had gotten into an argument. Ultimately, he told them, the two left the apartment together and he never saw Mr. Kelley again.

{¶ 14} A couple of hours later, Mr. Dunford changed his statement, telling the police that Mr. Kelley and Mr. Anzells had actually gotten into a fight, in which Mr. Kelley was wounded. He helped Mr. Anzells load Mr. Kelley into Mr. Anzells' vehicle and assumed Mr. Anzells was taking him to the hospital.

{¶ 15} When Mr. Dunford discovered Ms. West had arrived at the station and was fully cooperating with the police, he started to give them more details about where the body might be located and identified Mr. Anzells as the murderer. He suggested that he wear a wire and speak with Mr. Anzells. Ultimately, the wired conversation never took place as Mr. Anzells did not pick up the telephone. Mr. Dunford then confessed that upon Mr. Anzells' orders, he dismembered Mr. Kelley with a construction saw and placed the body parts in several garbage bags. He then loaded the bags into Mr. Anzells' trunk.

### {¶ 16} Police Interview with Ms. West

{¶ 17} Ms. West first told the detectives that Mr. Kelley had been murdered in their apartment solely by Mr. Anzells and that the body was taken "somewhere" for burial. She eventually identified all the participants in the gruesome murder, identifying Mr. Shawn Curtin; Mr. Cary Dunford, Mr. Dunford's father; as well as Mr. Dunford. The next morning she took the officers to a pond located off of Netcher Road in Ashtabula County, known as "Dead Man's Pond."

3

{¶ 18} Mr. Kelley's body was recovered in and around Dead Man's Pond. One of the bags containing several of Mr. Kelley's limbs had been buried close to the pond in a shallow grave dug by Mr. Dunford and Mr. Curtin. Two other bags were located in the pond after a dive rescue team was called in. Later, a sheathed bayonet was also recovered from the pond. Several of the limbs were not recovered, nor were Mr. Kelley's fingertips, which Mr. Curtin admitted to cutting off with metal shears and, which at some point in driving to dispose of the body, Mr. Anzells had ordered him to throw out the window.

{¶ 19} Ms. West confessed to assisting in the aftermath of the murder by cleaning the apartment and helping to dispose of the body. She subsequently pled guilty to one count each of gross abuse of a corpse and obstruction of justice, and was awaiting sentencing at the time of Mr. Dunford's trial.

{¶ 20} **Mr. Anzells is Apprehended**

{¶ 21} Upon learning that Mr. Anzells had several weapon violations and domestic violence charges, the police decided to obtain a warrant to search his home. They also learned that Mr. Anzells always carried a gun and knife on his person. As the SWAT team forcibly entered the home, Mr. Anzells jumped out of his bedroom, brandished his gun at one of the officers, and was shot. He died at the scene.

{¶ 22} **The Night of the Murder**

{¶ 23} Mr. Dunford had been friends with Mr. Kelley for quite some time, acting as his middle-man during drug runs and allowing Mr. Kelley to deal his crack cocaine from his apartment in exchange for some crack. Mr. Dunford had met Mr. Anzells several months prior and they would often purchase crack cocaine and oxycontins from each other. On the night of the murder, Mr. Dunford asked Mr. Kelley if he wanted to meet Mr. Anzells, and Mr. Anzells came over shortly thereafter. Throughout the night, in between drug deals, with Mr. Dunford acting as Mr. Kelley's runner, the four got high.

{¶ 24} Around midnight Mr. Kelley ran out of crack. Mr. Dunford called a friend and customer, Mr. Mark Kightslinger, and asked him if he would give him a ride to a gas station to wait for Mr. Kelley's supplier. When the dealers arrived, Mr. Dunford drove with the two unidentified men back to his apartment. Mr. Kelley met the men in their vehicle, who refused to come upstairs, and resupplied while Mr. Dunford, Ms. West, and Mr. Anzells waited in the apartment.

{¶ 25} The four smoked more crack and while in the kitchen with Mr. Dunford and Ms. West, Mr. Anzells told them he wanted Mr. Kelley's drugs. The four continued to smoke crack, and, at some point, Mr. Kelley and Ms. West went to sit in the dining room, leaving Mr. Anzells and Mr. Dunford together in the dining room. Ms. West overheard Mr. Anzells tell Mr. Dunford he wanted Mr. Kelley's money.

{¶ 26} According to Ms. West, Mr. Anzells walked into the living room several minutes later and stabbed Mr. Kelley with a short knife that had a curved blade. Mr. Dunford ran out to assist him and started to stab Mr. Kelley with a long knife that had a brown handle. Somehow, Mr. Kelley managed to break free and reach the door.

{¶ 27} The two caught up to him and continued to stab him at the top of the stairs until he fell to the bottom landing. Mr. Anzells then turned to Ms. West and threatened to kill her and her daughter if she spoke of this to anyone.

### {¶ 28} The Aftermath-Dismemberment and Disposal

{¶ 29} The three smoked more of Mr. Kelley's crack while they tried to figure out how to dispose of the body. They tried locating a truck, which after several hours proved unsuccessful. Mr. Anzells suggested they dismember the body and load it into his trunk. Mr. Anzells, in fact, did not participate in the actual dismemberment because he was physically unable. His wife testified and the coroner confirmed that he underwent kidney dialysis three times a week, had stomach and liver cancer, as well as congestive heart failure, among other medical problems such as emphysema.

{¶ 30} Failing to locate a truck, Mr. Dunford called his friend, Mr. Shawn Curtin, to assist them. When Mr. Curtin arrived at the apartment, the three told him that Mr. Kelley had been attempting to rape Ms. West and that Mr. Anzells and Mr. Dunford had killed him. Mr. Curtin did not believe them until Mr. Dunford showed him Mr. Kelley's body that was lying on a wooden pallet, covered in a carpet downstairs.

{¶ 31} The four then went upstairs to smoke more crack. Throughout the course of the night, over $300 of crack cocaine was smoked.

{¶ 32} Mr. Curtin testified that Mr. Anzells, after threatening his life, directed him to cut Mr. Kelley's fingertips off with metal shears. Mr. Anzells then left for a short time because he wanted to be at home when his children woke up. Mr. Curtin held the body down while Mr. Dunford dismembered the body with a saw, severing the head and limbs from the torso. Although Mr. Anzells had directed him to use a crowbar to smash Mr. Kelley's teeth, Mr. Dunford could not bring himself to do that final act.

{¶ 33} Mr. Anzells returned with garbage bags, in which they placed the body parts, and then loaded the bags into Mr. Anzells' car. Mr. Curtin rode in the front passenger seat with Mr. Anzells driving, while Mr. Dunford and Ms. West, who had been upstairs cleaning and painting over the blood, rode in the back. Mr. Dunford directed Mr. Anzells to his father's house, not knowing where to dispose of the body.

{¶ 34} When they arrived, Mr. Dunford's father, Cary, was outside with a cable service person. Mr. Dunford went to speak to his father, while the other three waited in the car. He walked with his father into the side-yard and without giving him any details or explanation, told him he killed a man and did not know where to dispose of the body. His father was in shock, and testified that he did not know what to do and that, quite frankly, he did not want to believe his son. He told his son about a pond he knew of in Pierpont, called "Dead Man's Pond." Mr. Dunford then asked for several items, taking a fishing pole and a shovel, among other items, including several cinder blocks. At some point during their conversation, the other three went into the house and Mr. Dunford introduced Mr. Anzells and Mr. Curtin to his father.

{¶ 35} After Mr. Dunford collected what he needed, his father told all four of them to leave his home. Mr. Dunford's father voluntarily cooperated with the police, informing them of what he knew, and ultimately pled guilty to one count of obstruction of justice. He was sentenced to a serve one year in prison, the maximum term of imprisonment for the fifth degree felony.

{¶ 36} The four arrived at Dead Man's Pond and Mr. Anzells directed Mr. Dunford and Mr. Curtin to bury the various bags. Mr. Anzells and Ms. West waited a short distance away, pretending to fish. One of the bags was buried, and the two others were thrown in the pond, weighted with tied cinder blocks. According to Mr. Dunford, Mr. Anzells gave one knife to Mr. Curtin and one knife to Mr. Dunford to throw into the pond.

{¶ 37} Dr. Andrea McCollum, the coroner for the Cuyahoga Coroner's Office, examined the body parts. Mr. Kelley had identifying tattoos on both arms, and subsequent DNA tests linked all the body parts found as belonging to Mr. Kelley's person. The cause of death was from multiple stab wounds, approximately 48 were found on the head and trunk, with visceral, vascular, and skeletal injuries. Mr. Kelley tested positive for coke ethylene, cocaine, and cocaine metabolites, indicating he had been using for a period of several days, as did Mr. Anzells.

{¶ 38} Dr. Pamela Lancaster, the deputy coroner for Ashtabula County, confirmed Dr. McCollum's verdict and testified that the official coroner's verdict for Mr. Kelley was homicide from multiple stab wounds with dismemberment.

*State v. Dunford*, 2010-Ohio-1272 (Ohio Ct. App. Mar. 26, 2010).

## II. Procedural Background

### A.  State Trial and Conviction

Dunford was indicted on 19 counts, including charges of aggravated murder, complicity to aggravated murder, murder, robbery, felonious assault, aggravated robbery, robbery, complicity to robbery, complicity to felonious assault, obstructing justice, tampering with the evidence, and gross abuse of a corpse.  A nine day jury trial commenced on March 17, 2009.  Doc. 7-18, p.1-2.  At the trial Dunford testified in his own defense.  Doc. 7-22, pp.1228-1377.  The jury returned verdicts of guilty on all 19 counts.  *State v. Dunford*, 2010-Ohio-1272 (Ohio Ct. App. Mar. 26, 2010), ¶42.  Dunford was sentenced to life imprisonment without the possibility of parole for the various murder, robbery, and felonious assault charges.  Id. at ¶43.  On the counts of obstructing justice and tampering with the evidence, Dunford was sentenced to concurrent five-year terms, to be served consecutively to the life sentence imposed for the murder.  Id.  Lastly, Dunford was sentenced to serve a consecutive one-year term of imprisonment for gross abuse of a corpse.  Id.

### B.  Direct Appeal

Dunford, through new counsel Patricia Smith, filed a notice of appeal to the Eleventh District Court of Appeals (COA 2009-A-0027) on June 3, 2009.  Doc. 7-6.  In his direct appeal, Dunford presented three assignments of error:

1.  The evidence is insufficient to sustain convictions for the elements of prior calculation and design.

2.  The weight of the evidence did not prove beyond a reasonable doubt that the appellant was guilty of aggravated murder, murder, felonious assault, aggravated robbery, robbery.

   3.  The trial court erred when it imposed consecutive sentences without making a finding of fact pursuant to O.R.C. §2929.14.

Doc. 7-7, pp.17, 24, 29.[2]

The appellate court found Dunford's arguments were without merit and affirmed the judgment of the trial court on March 29, 2010.  Doc. 7-9.  Dunford did not appeal the Eleventh District's March 29, 2010 order to the Ohio Supreme Court within the 45-day time period for seeking a timely direct appeal.[3]  Doc. 1, p.2.  Doc. 7, p.8.  The 45-day time period for seeking a timely appeal to the Ohio Supreme Court from the March 29, 2010 order expired on Thursday, May 13, 2010.  Doc. 7.

### C.  Application for reopening (App. R. 26(B))

On June 24, 2010, 42-days after the 45-day time period for filing a direct appeal to the Ohio Supreme Court had expired, Dunford filed a pro se application to reopen his direct appeal to the Eleventh District Court of Appeals pursuant to Ohio App. R. 26(B).  Doc. 7-11. Ohio App. R. 26(B) provides:

> (1) A defendant in a criminal case may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel. An application for reopening shall be filed in the court of appeals where the appeal was decided within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time.

---

[2] Document page numbers cited correspond to ECF Doc. page numbers.

[3] S.Ct.Prac.R. 7.01(A)(1)(a)(i), "To perfect a jurisdictional appeal from a court of appeals to the Supreme Court as defined by S.Ct.Prac.R. 5.02(A), the appellant shall file a notice of appeal in the Supreme Court within *forty-five days* from the entry of the judgment being appealed. The date the court of appeals fi led its judgment entry for journalization with its clerk, in accordance with App.R. 22, shall be considered the date of entry of the judgment being appealed." (emphasis added)

Pursuant to 26(B) Dunford argued that his direct appeal counsel was constitutionally ineffective because counsel did not raise an assignment of error based on allied offenses, which would have impacted the consecutive sentencing determination.  Doc. 7-11, Doc. 7, p.9.  On September 23, 2010, the Eleventh District denied the application.  Doc. 7-12.

Dunford filed a timely pro se appeal on November 8, 2010, to the Ohio Supreme Court from the denial of his 26(B) application.  Doc. 7-13.  Although his appeal was from the denial of a 26(B) application (arguing ineffective assistance of counsel), Dunford attempted to expand the issues by presenting the following four propositions of law:

1. The evidence is insufficient as a matter of law to support the element of prior calculation and design.

2. Appellant (sic.) conviction is against the manifest (sic.) weight of the evidence for the offenses of aggravated murder, murder, felonious assault, aggravated robbery, and robbery.

3. The prior two propositions of law involve the substantial constitutional issue of due process which can only be properly decided by the Ohio Supreme Court.

4. Appellant's right to raise the issue of ineffective assistance of counsel herein should not be barred by res judicata.

Doc. 7-13.

The State filed a memorandum in response to jurisdiction. Doc. 7-14.  The State argued that that the first three propositions of law were without merit because Dunford failed to file a notice of appeal from the Eleventh District's direct appeal decision in Case 2009-A-0027 within 45 days as required by law.  Doc. 7-14, p.16.  The Ohio Supreme Court dismissed the appeal on January 19, 2011, as not involving any substantial constitutional question.  Doc. 7-15.

### D.  Petitioner's Writ of Habeas Corpus

Dunford brought a petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.

Doc. 1.  Dunford's petition was docketed by the Clerk of Court on September 26, 2011. Doc. 1.[4]

Dunford's two Grounds for relief are set forth on page 1 above.


### III. Law and Analysis

### A.  Procedural Barriers to Review

Because Petitioner is appearing *pro se*, his pleadings are held to a less stringent standard than

those prepared by counsel.  *Urbina v. Thomas,* 270 F.3d 292, 295 (6th Cir. 20*0*1).  However all

petitioners must meet certain procedural requirements in order to have their claims reviewed in

federal court.  *Smith v. Ohio Dep't of Rehab. & Corr.,* 463 F.3d 426, 430 (6th Cir. 20*0*6).

"Procedural barriers, such as statutes of limitations and rules concerning procedural default and

exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim."

*Daniels v. United States*, 532 U.S. 374, 381 (20*0*1).

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No.

104-132, 110 Stat. 1214 ("AEDPA"), apply to Dunford's habeas petition because he filed it after

the effective date of the AEDPA.  *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 20*0*7).  The

applicable AEDPA provisions state:

(b)(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to
the judgment of a State court shall not be granted unless it appears that--

(A) the applicant has exhausted the remedies available in the courts of the State; or

---

[4] Dunford's petition reflects that he signed the petition on November 20, 2011.  It is unclear if the Clerk of Court
erred in docketing the petition or if Dunsford erred in dating his petition.  In order to avoid prejudice to Dunford, the
Court assumes that he filed his habeas petition on the earlier date, September 26, 2011.

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

 (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C.A. § 2254.

Under the statute, a federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court.  28 U.S.C. § 2254(b)(1)(A).  A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action.  28 U.S.C. § 2254(b), (c); *Anderson v. Harless*, 459 U.S. 4, 6  (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)) ("[f]ederal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts").  A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).  For a claim to be fully and fairly presented, the same factual and theoretical substance of the claim must be presented to the state courts for review.  *Manning v. Alexander,* 912 F.2d 878, 881 (6th Cir. 1990).  If under state law there remains a remedy that a petitioner has not yet pursued, the exhaustion requirement has not been met and the federal habeas court cannot entertain the merits of the claim.  28 U.S.C § 2254(c).  *See also Sultaana v. Bova,* Case No. 1:12CV3117, 2013 WL 3947647 (N.D. Ohio July 31, 2013).  The purpose of the

exhaustion requirement is to promote comity between federal and state courts. *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

### B.   Dunford did not exhaust the claims in his federal habeas petition

Respondent contends that Dunford failed to exhaust the two grounds for relief stated in his Petition because he did not present those claims to the Ohio Supreme Court.    Doc. 7, p.19.  A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).

Petitioner's Ground One (manifest weight of the evidence) was argued on direct appeal to the Eleventh District in the second assignment of error in Court of Appeals Case No. COA 2009-A-0027 (Doc. 7-7, p.24).[5]  Similarly, Petitioner's Ground Two (insufficient evidence of prior calculation and design) was argued on direct appeal to the Eleventh District in the first assignment of error in COA 2009-A-0027 (Doc. 7-7, p.17).[6] On March 29, 2010, the Eleventh District Court of Appeals found Dunford's assignments of error were without merit.  Doc. 7-9, p.1.  Dunford did not appeal the Eleventh District's March 29, 2010 order to the Ohio Supreme

---

[5] As a result of the disposition recommended herein, this Court need not reach the issue whether the claims now raised in Grounds One and Two were "fully and fairly presented" to the appellate court on Dunford's direct appeal. *See Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) (For a claim to be fully and fairly presented, the same factual and theoretical substance of the claim must be presented to the state courts for review); and *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984) (Fair presentment requires that a petitioner make the state courts aware that the claim presented is a federal claim and is "not merely arising under state law.")

[6] *See supra*, footnote 4.

Court within the 45-day time period for seeking a timely direct appeal.[7]  Doc. 1, p.2.  Doc. 7, p.8.

The 45-day time period for seeking a timely appeal to the Ohio Supreme Court from the March

29, 2010 order expired on Thursday, May 13, 2010.  Doc. 7.

Petitioner contends that he did pursue an appeal to the Ohio Supreme Court on November 8,

2010, after first applying to the court of appeals under App. R. 26(B) for a reopening of his

appeal.  Doc. 14, p.2.


### a.  Dunford's application for reopening under App. R. 26(B) was not part of the direct appeal and, therefore, does not satisfy the exhaustion requirement

Dunford argues that he afforded the state appellate and supreme courts "one full

opportunity to resolve any constitutional issues" when he invoked the 26(B) appellate review

process and then appealed his Rule 26(B) denial to the Ohio Supreme Court.  Doc. 14, p.3.  As

set forth above, in his pro se memorandum in support of jurisdiction filed with the Ohio Supreme

Court following the court of appeals' denial of his Rule 26(B) application, Dunford presented

four propositions of law, three of which related to his direct appeal and only one of which (the

fourth) pertained to the 26(B) issue of ineffective assistance of counsel.  Dunford also stated in

his jurisdictional memorandum, "It is from the denial of Appellant's direct appeal and the denial

of his application to reopen the appeal that Appellant now petitions this honorable court."  Doc.

7-13, p.6.  In its memorandum in response to jurisdiction, the state argued that the first three

propositions of law were not properly before the court because Dunford had missed the deadline

---

[7] S.Ct.Prac.R. 7.01(A)(1)(a)(i), "To perfect a jurisdictional appeal from a court of appeals to the Supreme Court as defined by S.Ct.Prac.R. 5.02(A), the appellant shall file a notice of appeal in the Supreme Court within *forty-five days* from the entry of the judgment being appealed. The date the court of appeals fi led its judgment entry for journalization with its clerk, in accordance with App.R. 22, shall be considered the date of entry of the judgment being appealed." (emphasis added)

for appealing the March 29, 2010 Eleventh District Court of Appeals decision on his direct appeal.  Doc. 7-14, p.3.  The Ohio Supreme Court dismissed Dunford's appeal as not involving any substantial constitutional question.  Doc. 7-15.

The state accurately stated the law.  Because Dunford had missed the deadline for appealing the March 29, 2010, court of appeals' direct appeal decision any arguments made relating to that decision were untimely and not properly before the Ohio Supreme Court on appeal from the denial of Dunford's Rule 26(B) application.  An application for reopening under App.R. 26(B) does not constitute part of the direct appeal.  *Lopez v. Wilson*, 426 F.3d 339, 351 (6th Cir. 20*05)* ("a Rule 26(B) application to reopen is part of the collateral, postconviction process rather than direct review."); *Morgan v. Eads*, 2004-Ohio-6110, 104 Ohio St. 3d 142, 143, 818 N.E.2d 1157, 1158-59 (2004).  Under the Ohio Rules of Appellate Procedure, a court of appeals has the authority to consider an application under App.R. 26(B) even though an appeal of the case is pending before the Ohio Supreme Court. See S.Ct.Prac.R. II(2)(D)(1) ("After an appeal is perfected from a court of appeals * * *, the court of appeals *is divested of jurisdiction, except * * * to rule on an application timely filed * * * pursuant to App.R. 26* "). (Emphasis added.) *Morgan,* 104 Ohio St. 3d at 144-45.  The fact that the court of appeals has authority to grant an App.R. 26(B) application even while the case is on appeal to the Ohio Supreme Court, demonstrates that the App.R. 26(B) process is not part of the original appeal.  *Id.*  ("It defies logic to assume that two *original* direct appeals are occurring simultaneously in this court and in the court of appeals.") Under Ohio law, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal.  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 20*06).

It is clear that Dunford's App. R. 26(B) appeal was not part of his direct appeal. Dunford's belated attempt to raise direct appeal issues as part of his Rule 26(B) appeal to the Ohio Supreme Court was improper and ineffective.  Accordingly, Dunford's claims relating to the court of appeals' March 29, 2010, direct appeal decision were not timely presented to the Ohio Supreme Court.  Thus, Dunford failed to exhaust those claims and cannot obtain habeas relief on them.  *See Coleman v. Mitchell,* 244 F.3d 533, 538 (6th Cir. 2004) (A petitioner "cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court.")  A petitioner's failure to exhaust state court remedies requires dismissal of the entire petition. *Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *See also, Parsons v. Ohio Adult Parole Auth.,* 5:04 CV 2531, 2005 WL 1123474 (N.D. Ohio Mar. 30, 2005); 28 U.S.C. §2254(c).

Although Dunford has not exhausted his state court remedies, his claims are not procedurally defaulted[8] because he arguably has a remedy remaining under Ohio law as explained below.

### b.  Dunford may seek a delayed appeal in the Ohio Supreme Court

Where a state procedural rule, if applicable, would cause a petitioner to default on an otherwise unexhausted claim, the habeas court should find procedural default only "if it is *clear* that [the] claims are now procedurally barred under [state] law." *Gray v. Netherland,* 518 U.S. 152, 161–162, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) (emphasis added) (quoting *Castille v.*

---

[8]  The doctrine of procedural default is closely related to that of exhaustion. *Francis v. Henderson,* 425 U.S. 536, 538-539 (1976).  A petitioner "may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams,* 460 F.3d at 806 (citing *O'Sullivan v. Boerckel,* 526 U.S. 838, 848 (1999)).   "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams,* 460 F.3d at 806.

*Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989)). Respondent argues that

Dunford may seek a delayed appeal pursuant to Ohio S. Ct. Prac. R. 7.01(A)(4)[9], which

provides:

> (a) In a felony case, when the time has expired for filing a notice of appeal in the
> Supreme Court, the appellant may file a delayed appeal by filing a notice of appeal and a
> motion for delayed appeal that complies with the following requirements:
>> (i)   The motion shall state the date of entry of the judgment being appealed
>>       and the reasons for the delay;
>> (ii)  Facts supporting the motion shall be set forth in an affidavit;
>> (iii) A copy of the court of appeals' opinion and the judgment entry being
>>       appealed shall be attached to the motion.
>
> (b) A memorandum in support of jurisdiction shall not be filed at the time a motion for
> delayed appeal is filed. If the Supreme Court grants a motion for delayed appeal, the
> appellant shall file a memorandum in support of jurisdiction within thirty days after the
> motion for delayed appeal is granted. If a memorandum in support of jurisdiction is not
> timely filed after a motion for delayed appeal has been granted, the Supreme Court wil
> dismiss the appeal.
> (c) The provision for delayed appeal does not apply to appeals involving postconviction
> relief or appeals brought pursuant to App.R. 26(B). The Clerk shall refuse to file motions
> for delayed appeal involving postconviction relief or App.R. 26(B).

Doc. 7, pp.19-20.

Courts in this District have held that a petitioner's federal habeas claims are not exhausted

where he may yet file a motion for delayed appeal in the Supreme Court of Ohio and therefore

has a potential remaining state avenue of relief. *Williams v. Bobby,* No. 1:06CV2032, 2007 WL

2156402, at *7 (N.D.Ohio, July 25, 2007), unpublished (third and fourth grounds for relief not

exhausted because petitioner still had remedy of motion for delayed appeal to Supreme Court);

*Hennis v. Warden, Chillicothe Correctional Inst.,* No. 3:10CV202, 2011 WL 796197, at *3

(S.D.Ohio Feb. 8, 2011); *Moore v. Erwin,* No. 1:02CV850, 2005 WL 1073371, at *2, (S.D.Ohio

---

[9]  In Respondent's Return of Writ, he cites to Ohio S. Ct. Prac. R. 2.2.(A)(4), however, on January 1, 2013,
amendments to the Rules of Practice of the Ohio Supreme Court included renumbering rules.  S.Ct.Prac.R.
2.2(A)(4) has been renumbered as 7.01(A)(4).

Apr.18, 2005), unpublished (" '[r]equiring petitioner to pursue a delayed appeal in the state courts prior to filing a federal habeas corpus petition would not be futile and will serve the interests of federal-state comity by giving the Ohio appellate courts the opportunity to address petitioner's claims on the merits."); *Raver v. Brunsman,* No. 2:06CV952, 2007 WL 2670060, at 89–* 10 (S.D.Ohio Sept.7, 2007), unpublished (petitioner not excused from exhausting claims before Ohio Supreme Court simply because that court may be unlikely to grant his motion for delayed appeal); *contra, Mills v. Hudson,* No. 3:08CV1974, 2009 WL 2232858, at *6 (N.D.Ohio July 22, 2009) (finding that, since petitioner has no right to raise his actual claims in the motion for delayed appeal but must first petition the court for permission to raise the claims, it is not an "available" remedy under 28 U.S.C. § 2254(c), which states that a state remedy is "available" if petitioner has the right under state law to "raise ... the question presented").

Failure to exhaust applies where state remedies are "still available at the time of the federal petition." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982). Because Dunford arguably still has a remedy (delayed appeal) in state court, his claims are unexhausted and not defaulted. 28 U.S.C. § 2254(c); *See Banks v. Jackson*, 149 F. App'x 414, 418 (6th Cir. 2005). Since Dunford's petition is not a mixed petition, this Court cannot hold the case in abeyance and the petition should be dismissed without prejudice. *See Rhines v. Weber*, 544 U.S. 269, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005).

### c. Prospective tolling of Dunford's petition

Petitioner timely filed his petition for writ of habeas corpus on September 26, 2011. The AEDPA proscribes a 1-year statute of limitations from "the date on which the judgment became

final by the conclusion of direct review or the expiration of the time for seeking such review."

28 U.S.C. § 2244(d)(1)(A).  In *Duncan v. Walker,* 533 U.S. 167, 121 S.Ct. 2120, 150 L.Ed.2d

251 (2001), the Supreme Court determined that the AEDPA limitations period does not toll

during the pendency of the habeas petition itself. *Id.* at 181-82. Thus, if Dunford's petition is

dismissed, the limitations period has already expired, foreclosing the possibility of a timely re-

filing in accordance with § 2244(d)(1)." *Griffin v. Rogers,* 399 F.3d 626, 632 (6th Cir.2005).

Petitioner will be unable to re-file timely in accordance with §2244(d)(1) unless this court

permits prospective equitable tolling.

When dismissing petitions for failure to exhaust state court remedies this Court has

utilized prospective equitable tolling under similar circumstances to ensure that petitioners could

return to federal court for habeas review. *See Brown v. Ohio Dep't of Rehab. & Correction,*

3:12CV00530, 2013 WL 1562909 (N.D. Ohio Apr. 15, 2013); *Papenfus v. Tibbals,* 289 F. Supp.

2d 897 (N.D. Ohio 2003).  The Sixth Circuit has held that prospective equitable tolling is

reasonable in unexhausted habeas corpus cases, so long as the District Court attaches conditions

to ensure expeditiousness.  *See Hargrove v. Brigano,* 300 F.3d 717 (6th Cir. 2002).  In *Hargrove,*

Petitioner Hargrove's petition was dismissed because his claims were unexhausted as he had not

filed an appeal to the Ohio Supreme Court and the District Court found that he could still do so

by filing a motion for delayed appeal.  *Id.* at 718.  The District Court tolled the statute of

limitations beginning on the date the petition was filed in federal court "on the condition that

Hargrove pursue his state remedies within thirty days of the court's order and return to the

federal court within thirty days of exhausting his state remedies."  *Id.*  The U.S. Supreme Court

recently affirmed that the statute of limitations set forth in §2244(d) may be equitably tolled in appropriate cases, explaining:

> We recognize that AEDPA seeks to eliminate delays in the federal habeas review process. *See Day,* 547 U.S., at 205–206, 126 S.Ct. 1675; *Miller–El v. Cockrell,* 537 U.S. 322, 337, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). But AEDPA seeks to do so without undermining basic habeas corpus principles and while seeking to harmonize the new statute with prior law, under which a petition's timeliness was always determined under equitable principles. *See Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) ("AEDPA's present provisions ... incorporate earlier habeas corpus principles"); *see also Day,* 547 U.S., at 202, n. 1, 126 S.Ct. 1675; id., at 214, 126 S.Ct. 1675 (Scalia, J., dissenting); 2 R. Hertz & J. Liebman, Federal Habeas Corpus Practice and Procedure § 24.2, pp. 1123–1136 (5th ed.2005).

*Holland v. Florida,* 560 U.S. 631, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010).  The *Holland* Court provided a two-factor test for determining when equitable tolling is appropriate. "We have previously made clear that a 'petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Id.* at 2562. (quoting *Pace,* 544 U.S., at 418, 125 S.Ct. 1807 (emphasis deleted)).[10]

With regard to the first *Holland* factor, Petitioner, a *pro se* litigant, has diligently pursued his rights. He timely filed his habeas petition.  He also timely filed his direct appeal with the state court of appeals and timely filed his application for reopening under Rule 26(B). Petitioner attempted to bring his direct appeal claims to the Ohio Supreme Court although, as discussed above, he used the wrong procedural vehicle, an appeal from an order denying his Rule 26(B)

---

[10] Prior to *Holland*, the Sixth Circuit provided guidelines for determining the appropriateness of equitably tolling a statute of limitations.  *Andrews v. Orr,* 851 F.2d 146 (6th Cir. 1988).  *Andrews* set forth five factors to consider:  (1) the petitioner's lack of notice of the filing requirement; (2) the petitioner's lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the respondent; and (5) the petitioner's reasonableness in remaining ignorant of the legal requirement for filing his claim.  The Sixth Circuit has since adopted the *Holland* test for equitable tolling cases under §2244.  *See Eberle v. Warden, Mansfield Corr. Inst.,* 12-4213, 2013 WL 4017144 (6th Cir. Aug. 8, 2013).

application, and he filed his notice of appeal to the Ohio Supreme Court after the deadline for appealing the court of appeals' direct appeal decision had expired.

With regard to the second *Holland* factor, Petitioner's traverse makes clear that he was confused as to the state appeal and federal exhaustion requirements.  Petitioner states, "Petitioner certainly afforded both the state appellate and supreme courts 'one full opportunity to resolve any constitutional issues' when he invoked the 26(B) appellate review process afforded by Ohio law, and then appealed those same constitutional issues in a timely manner to the Ohio Supreme Court."  Doc. 14, p.3.

Petitioner is not alone in being puzzled as to the relationship between Ohio direct appeals and Rule 26(B) appeals.  At one time, the Sixth Circuit held that Rule 26(B) applications were part of the state court's direct review process.  *White v. Schotten,* 201 F.3d 743 (6th Cir.2000), cert. denied, 531 U.S. 940, 121 S.Ct. 332, 148 L.Ed.2d 267 (2000).  However, *White's* holding that Rule 26(B) applications to reopen are part of direct review led to tension and confusion in subsequent opinions in the Circuit.  *See Lopez,* 426 F.3d at 348.  ("Our decisions in *Bronaugh, Searcy,* and *Griffin,* although paying lip-service to *White,* are in direct conflict with it.")  As a result, the Sixth Circuit clarified in 2005 that a Rule 26(B) application is a collateral matter and not part of the direct review.  *Id.* at 352.  Considering Dunford's pro se status and the past uncertainty as to the relationship between direct appeals and Rule 26(B) appeals, his mistaken belief that the exhaustion requirement could be met through his Rule 26(B) appeal is understandable and the undersigned finds that the second prong of the *Holland* test is satisfied.

The circumstances presented in this case thus warrant granting prospective equitable tolling under the U.S. Supreme Court's opinion in *Holland.*

### IV. Conclusion and Recommendation

For all of the reasons provided above, the undersigned Magistrate Judge **RECOMMENDS** that this Court **DENY** Dunford's Petition for Writ of Habeas Corpus (Doc. 1) and **DISMISS** this action without prejudice pursuant to Rule 4 of the Rules Governing Section 2254 Cases.  The undersigned further **RECOMMENDS** that this Court equitably toll the statute of limitations, effective September 26, 2011, on the condition that Dunford pursue his state remedies within thirty days of the court's order and return to federal court within thirty days of exhausting his state court remedies.


September 30, 2013

**KATHLEEN B. BURKE**
**U.S. MAGISTRATE JUDGE**


### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).